## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### Southern Division

| | |
|---|---|
| **EDWARD MUDD, JR.** ) | |
| **WILD ALABAMA** ) | |
| ) | |
|     **Plaintiffs** ) | |
| v. ) | **Civil Action No.-03-148-VEH** |
| ) | |
| **CHRISTINE TODD WHITMAN** ) | |
| **Administrator Environmental** ) | |
| **Protection Agency, et al.** ) | |
| ) | |
|     **Defendants.** ) | |

### OPINION ON DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

I. Jurisdiction and Venue

Plaintiffs Edward W. Mudd, Jr. ("Mudd") and Wild Alabama, a nonprofit organization ("WA"), filed this action on January 22, 2003, against Jimmy Palmer ("Palmer"), the regional administrator of the United States Environmental Protection Agency and Christine Todd Whitman ("Whitman"), EPA Administrator (collectively "EPA"). Jurisdiction is federal question, 28 U.S.C. § 1331, premised on the citizen suit provisions of the Clean Water Act ("CWA"), 33 U.S.C. § 1365, and the Endangered Species Act, 16 U.S.C. § 1540(g). Mudd and WA also invoke mandamus relief under 28 U.S.C. § 1361, seek declaratory relief under 28 U.S.C. § 2201, and injunctive relief pursuant to 28 U.S.C. § 2211.

Venue is based upon the Plaintiffs being residents of, and "much of the subject matter is in", this District.

The pleadings have closed, and EPA has moved for judgment on the pleadings. Doc. 13. The issues have been thoroughly briefed, docs. 13 - 16.

> II. Statutory and Regulatory Framework of the Plaintiffs' Claims
>
> Since 1972, the federal and state governments have worked together to restore and maintain the integrity of the nation's waters, in a partnership governed by the Federal Water Pollution Control Act, commonly known as the Clean Water Act, 86 Stat. 816 (codified as amended at 33 U.S.C. § 1251 *et seq.*) ("Clean Water Act"). *See Arkansas v. Oklahoma,* 503 U.S. 91, 101, 112 S.Ct. 1046, 1054, 117 L.Ed.2d 239 (1992) (describing partnership). Many duties to monitor and regulate pollution of the nation's waters are divided between the federal and state governments.
>
> Among other things, state governments are responsible for establishing water quality standards for all of their waterbodies. Water quality standards are designed to do two things: first, they designate the use or uses to be made of the water, such as fishing or swimming; and, second, they set the basic criteria that must be satisfied in order to safely permit those uses. 40 C.F.R. § 131.2. The second aspect of water quality standards, the water quality criteria, can be expressed in narrative form or in a numeric form, e.g. specific pollutant concentrations. *Id.* at § 131.3(b). We have described the second aspect of a water quality standard as setting the "level of water quality needed to safely allow [the waterbody's designated] use." *Sierra Club v. Meiburg,* 296 F.3d 1021, 1025 (11th Cir.2002). This level may be described as "constituent concentrations, levels, or narrative statements, representing a quality of water that supports a particular use." 40 C.F.R. § 131.3(b).

> While states are primarily responsible for establishing these water quality standards, the EPA, in turn, is required to undertake a review of any new or revised water quality standards adopted by the states. 33 U.S.C. § 1313(c)(2)(A). Among other things, this review involves a determination of the following:
>
>> Whether the state has adopted criteria that protect the designated water uses; [w]hether the State has followed its legal procedures for revising or adopting standards; [and w]hether the State standards which do not include the uses specified in section 101(a)(2) of the Act are based upon appropriate technical and scientific data and analyses....
>
> 40 C.F.R. § 131.5. Moreover, under the Clean Water Act, the state's water quality standards may only be revised if the change complies with the anti-degradation policy which EPA regulations mandate each state to adopt. 33 U.S.C. § 1313(d)(4)(B); *see* 40 C.F.R. § 131.12. Thus, any change must, at the very least, maintain the existing quality of each waterbody, preventing any further "degradation" of the waterbody's integrity. *PUD No. 1 of Jefferson County and City of Tacoma v. Wash. Dep't of Ecology,* 511 U.S. 700, 704, 114 S.Ct. 1900, 1905-06, 128 L.Ed.2d 716 (1994) (citing 33 U.S.C. § 1313(d)(4)(B)).

*FL PIRG v. EPA*, 386 F.3d 1070, 1073 (11th Cir. 2004)

In Alabama, the CWA is implemented and administered by the Alabama Department of Environmental Management ("ADEM") pursuant to EPA delegation. ADEM issues discharge permits to facilities and operations that discharge material into Alabama waterways. These permits are issued under the National Pollution Discharge Elimination System (NPDES). As part of its NPDES program, ADEM created, and issues, a general permit known as the general construction permit which

permits the discharge of sediment from construction projects.  ADEM also created, and issues, a storm water general permit that allows completed and operating facilities and sites to discharge pollutants (including sediment) from those facilities and sites during periods of rain.

Mudd and WA say the CWA also requires ADEM and/or EPA to identify waterways, or portions thereof, that do not meet water quality standards, known as "impaired" segments under § 303 of the CWA.  Mudd and WA says such segments include much of the Cahaba River, which is listed as impaired for sediment.  Impaired waterways are addressed through the implementation of Total Maximum Daily Loads ("TMDLs"), which, when implemented, identify the appropriate amounts of sediment for the sediment impaired waterways.  EPA and ADEM are said to be in the process of developing TMDLs for Alabama's waterways, including the Cahaba River, but ADEM has continued to permit construction projects which have greatly increased the sediment load.  Mudd and WA say this violates the CWA's implementing regulation found at 40 C.F.R. § 122.4, which provides that no permit may be issued to a new source or a new discharger if the discharge will cause or contribute to the violation of water quality standards.

### III.  Plaintiffs' Claims

Mudd and WA are interested in the water ecosystems of Alabama and the protection of those waterways and the endangered species associated with them. They say the EPA has failed to properly administer the statutes and regulations protecting both, and that they have been harmed in their enjoyment of these waterways and endangered species.  They say that the continued permitting of activities under the general construction and storm water permits violates the CWA and the Endangered Species Act.

Mudd and WA say that EPA "knows or should know", Complaint at 24., that ADEM has insufficient funds and personnel to enforce the CWA where construction projects are concerned, and that these shortfalls are hurting Alabama waterways in violation of § 303 of the CWA.

Mudd and WA say that EPA has failed its mandatory duty to ensure that Alabama administers the CWA and its regulations, failed to fully protect and maintain Alabama's "impaired waters" from sediment pollution, and has failed to require ADEM to comply with the CWA and its regulations.  They say EPA's failures are arbitrary, capricious, an abuse of discretion, and illegal under the CWA.

As to the Endangered Species Act ("ESA"), Mudd and WA say the increased sedimentation is contrary to sound management of endangered ESA listed species.

They say ADEM has consistently maintained it has no interest or state law mandate to protect ESA listed species, and that EPA has failed in its consultative and oversight duties with regard to ADEM's administration of the ESA, and specifically ADEM's harm to ESA listed species by continued issuance of water permits that increase sedimentation of impaired waterway segments. EPA has failed to formally consult with the U.S. Fish and Wildlife Service("FWS")[1] under section 7 of the ESA as to the potentially harmful impacts on ESA listed species from ADEM's permitting activities described above, or to require ADEM to so consult. The illegal permitting activities are said to constitute a "take" in violation of § 9 of the ESA.

Mudd and WA assert that there has to be a notice provision in ADEM's permit issuance process because, without it, no one, including the FWS, can know what construction projects are being considered for permit coverage.

Mudd and WA seek a declaration that EPA has violated the CWA and the ESA, and an order requiring EPA to ensure that ADEM's (general) construction and storm water permits comply with the CWA and ESA.

---

[1] FWS is the lead federal agency under the ESA.

## IV.  EPA's Motion For Judgment On The Pleadings

A.   Standard of Review

In passing on a Motion for Judgment on the Pleadings, the court accepts as true all of the non-movant's allegations and views them in the light most favorable to the non-movant. *Cannon v. City of W. Palm Beach*, 250 F.3d 1299, 1301 (11th Cir. 2001). Judgment is appropriate where there are no material facts in dispute and the movant is entitled to judgment as a matter of law.

B.   The Clean Water Act Claims

EPA first says Mudd and WA's claims against EPA are barred by sovereign immunity and that the requisite showing of waiver has not been met.  For purposes of this Opinion, the court says that the citizen suit provisions of the CWA are sufficient to overcome a general assertion of sovereign immunity, and the appropriate inquiry is whether or not the court has jurisdiction to hear this particular action.

EPA then says the court has no subject matter jurisdiction over the CWA claims because control over CWA's administration in Alabama has been transferred to ADEM.  The EPA argument, distilled here, is:

1.  § 402(c) of the CWA, 33 U.S.C. § 1342(c), permits EPA to authorize states to administer NPDES permitting programs and EPA so authorized Alabama's on October 19, 1979.  44 Fed. Reg. 61,452 (10/25/70).

2.  ADEM administers the NPDES program pursuant to ADEM regulations

published in the Ala. Admin. Code Chapters 335-6-6, 335-6-7 and 336-6-12.

3. EPA approved Alabama's general permitting program on June 26, 1991. 56 Fed. Reg. 32,209 (7/15/91).

4. Facilities seeking coverage under the general permit submit to ADEM a Notice of Intent to be covered, 40 C.F.R. § 122.28(b)(2), and may not discharge until ADEM acknowledges that the general permit covers the discharger. Ala. Admin. Code. R. 335-6-6-23(15)(a).

5. The citizen suit provision of the CWA, 33 U.S.C. § 1365(a)(2), authorizes suits where there has been a failure of the Administrator to perform any non-discretionary act or duty. *Preserve Endangered Areas of Cobb's History v. United States Army Corps of Eng'rs, Inc.* 87 F.3d 1242, 1249 (11th Cir. 1996).

In ¶1 of the Complaint, Mudd and WA assert that the EPA is under a mandatory duty to ensure that the State of Alabama administers § 303(e) of the CWA. As EPA points out, there is no such statutory language, just as there is no statutory basis for the "duties" asserted in ¶¶ 23, 26, and 28 of the Complaint. And Mudd and WA have not offered a cogent reason why EPA, having approved Alabama's permitting program, retains authority over the program besides that set out in the statute: objecting to the issuance of a permit or convening a proceeding to withdraw the State's NPDES permitting authority. 33 U.S.C. § 1342(c)(d); *Save the Bay, Inc. v. EPA*, 556 F.2d 1282, 1285 (5th Cir. 1977).

C.     The Deference Due EPA's Interpretation

While this section may have been better placed ahead of the CWA discussion in B., *supra*, the court puts it here for contextual reasons.  The CWA contemplates EPA oversight of state CWA NPDES programs to a degree, just as it contemplates substantial state involvement where, as here, the state adopts, and the EPA approves, a NPDES permitting program.  The question then becomes what is the appropriate degree of deference that a district court should afford the EPA in its administration of Alabama's NPDES program.

In general, reviewing courts typically grant substantial deference to the EPA's interpretation of statutes it administers and its implementing regulations.  The reasoning behind this deferential review is that "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("*Chevron*").  Deference to agency interpretation is particularly appropriate where the subject being regulated is technical and complex.  *Aluminum Co. of Am. v. Central Lincoln Peoples' Util. Dist.,* 467 U.S. 380, 390, 104 S.Ct. 2472, 81 L.Ed.2d 301 (1984).  An agency's interpretation of its own regulations must be given " 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.' " *Udall v. Tallman,* 380 U.S.

1, 16-17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965) (quoting *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 413-14, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945)). *See also*, *State of New York v. EPA*, 413 F.3d 3 (D.C. Cir. 2005) (*Chevron* deference applied, for the most part, to EPA 2003 Clean Air Amendments, particularly where the subject matter was technical and the statute contemplated the agency would issue rules and regulations).

Mudd and WA have offered no persuasive authority, actually very little authority at all, why the court should not defer to EPA's judgment on Alabama's NPDES program. The EPA has explicit CWA authority to withdraw its approval of Alabama's NPDES program, CWA § 402(c)(3). The Administrator conducts a public hearing, gives notice to the state, and if the state does not take appropriate corrective action within ninety (90) days, ". . . the Administrator shall withdraw approval of such program". 33 U.S.C. § 1342(c)(d).

Further, *Save the Bay*, *supra*, says that the Administrator's decision to withdraw a state's NPDES program is, under CWA §509(b)(1)(D), reviewed by the Court of Appeals, not the District Court, 33 U.S.C. § 1369(b)(1)(D).

In their Response, Mudd and WA say they are not attacking EPA's 1979 and 1991 approvals of Alabama's general permitting program. Rather, they challenge

". . . EPA's ongoing approval and funding of the illegal misuse and

misapplication of that general permit program. Plaintiffs are not challenging the general permit program on its face but rather EPA's ongoing approval of its use to approve new sources of pollution in impaired waterways in direct violation of 40 C.F.R. 122.4(I)."

Response at page 2.

*FL PIRG, supra*, makes it clear that this court has the duty to review challenged EPA action where the state NPDES agency has changed its program rules in a manner that could change water quality standards. In *FL PIRG*, the state called its program rule revision a "screening measure"; the Court of Appeals said the terminology was not dispositive and remanded to the District Court for determination of whether the new rule had the effect of modifying those standards, thereby triggering EPA's duty to review the new rule under the CWA. Here, the court does not see Mudd and WA as falling within the parameters of the statute and *FL PIRG*. Mudd and WA do not challenge an ADEM rule, or a revision of an ADEM rule; rather they challenge the effect of EPA's asserted failure(s) to properly monitor ADEM's issuance of permits.[2]

Even were the decision this court's to make, the court would be inclined to defer to EPA. The issue is not whether the court agrees that ADEM is doing a good job improving the quality of Alabama's waterways or keeping them clean, or whether

---

[2] As such, the challenges in this action do not appear to present a justiciable dispute. The federal judicial power extends only to "cases or controversies." U.S. Const. Art. III, Sec. 2; *Atlanta Gas Co. v. Aetna Cas. and Sur. Co.,* 68 F.3d 409, 414 (11th Cir.1995).

or not EPA is performing appropriate oversight of Alabama's NPDES program. That decision is not the court's to make. The tension here is not between the executive and judicial branches of government, it is between the executive and legislative. If Congress is dissatisfied with EPA's actions, it can amend the CWA. By the same token, if Congress wishes to hobble enforcement through the appropriations process, Congress may do so, at least up to the point where the statute's mandatory commands are violated. Unfunded Congressional mandates are nothing new, and Alabama is no stranger thereto. It is axiomatic that Congress controls the purse strings of government and if it chooses to enact regulatory legislation and then under-fund the enforcement thereof, it is not for this court to "fill in the gaps" with its own ideas of appropriate enforcement.

When the court further considers the technical complexity of the CWA decision making, the need for technical and scientific information exchanges between EPA and ADEM, fortified by the court's role in a government of separate powers, the case for deference here, already significant, becomes strong. It's not whether the court agrees or disagrees with Mudd and WA's assessment of the wisdom of EPA's oversight of ADEM's management of the Alabama NPDES program, it's that the court does not believe the law permits it to second guess the allocation of legislative or executive resources in the controversy before it. Absent a clear violation of

statutory duty, which the pleadings do not make out, the court will not order EPA to change its manner of overseeing ADEM's NPDES permitting program.

Finally, the court notes that Mudd and WA do have a forum where they can obtain the relief they seek: *Save the Bay, supra*, says that the appropriate remedy is to petition the EPA to withdraw its approval of Alabama's NPDES program.[3] Practically speaking, an EPA threat of that approval withdrawal would have some effect on ADEM. If it didn't, or the agency declined to do so, Mudd and WA could seek review of the agency decision in the Court of Appeals. In any event, on the record before it, the court says that it is not the proper forum for Mudd and WA to seek relief, nor does it see them entitled to relief.

D.     The Endangered Species Act Claims

Mudd and WA's ESA claims are similar to the CWA claims: ADEM is issuing permits it shouldn't, or issuing permits in violation of the ESA[4], and the court should step in to make EPA take corrective action. Specifically, they claim:

1. Increased sedimentation in the state's waterways is contrary to sound management of endangered ESA listed species.

---

[3] At page 23 of its Memorandum, doc. 13, EPA says that Mudd and WA have petitioned EPA to withdraw Alabama's approval to issue NPDES permits, but the administrative process is not complete and that this action is an attempt to circumvent that process. The court assumes EPA is actively reviewing the petition, not letting it gather dust on a shelf. Otherwise, the EPA's argument is specious and misleading.

[4] ADEM is not a party to this action.

13

2. ADEM has consistently maintained it has no interest or state law mandate to protect ESA listed species.

3. EPA has failed in its consultative and oversight duties with regard to ADEM's administration of the ESA, specifically ADEM's harm to ESA listed species by continued issuance of water permits that increase sedimentation of impaired waterway segments.

4. EPA has failed to formally consult with the U.S. Fish and Wildlife Service("FWS")[5] under section 7 of the ESA as to the potentially harmful impacts on ESA listed species from ADEM's permitting activities described above, or to require ADEM to so consult. The illegal permitting activities are said to constitute a "take" in violation of under § 9 of the ESA.

5. There has to be a notice provision in ADEM's permit issuance process because, without it, no one, including the FWS, can know what construction projects are being considered for permit coverage.

There are a number of problems with these assertions. EPA points out in its Reply that it is difficult to say exactly what agency action Mudd and WA challenge. The court agrees. There must be a specific, and final, agency action before court review is available. *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 894 (1990). Because the ESA contains no standard of review, the court follows the D.C. Circuit's observation that where Congress has provided for judicial review, but has not provided standards to govern the review, "the courts have generally held that the court's review is governed by the APA's scope and standard of review." *Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678, 685 (D.C. Cir. 1982). *See also*

---

[5] FWS is the lead federal agency under the ESA.

*Bennett v. Spear*, 520 U.S. 154, 117 S. Ct. 1154, 137 L. Ed. 2d 281 (1997) (holding that the APA, by its terms, provides a right to judicial review of all "final agency action for which there is no other adequate remedy in a court," and applies universally except to the extent that (1) a statute precludes judicial review; or (2) agency action is committed to agency discretion by law); *Northcoast Environmental Center v. Glickman*, 136 F.3d 660 (9th Cir. 1998) (APA provides for judicial review of agency actions if two requirements are met: (1) the activity in question must be identified as an "agency action" within the meaning of the statute, and as a "final" agency action if the review is sought under the general review provisions of the APA, and (2) the plaintiff must establish that he has suffered a legal wrong, or will be adversely affected or aggrieved within the meaning of a relevant statute).

Except for agency actions that are adjudicatory in nature, the APA provides that agency actions shall not be set aside unless found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." APA, 5 U.S.C.A. § 706(2) (1966). *See, e.g., Center for Marine Conservation v. Brown*, 917 F. Supp. 1128 (S.D. Tex. 1996), *Carlton v. Babbitt, 900 F. Supp*. 526 (D.D.C. 1995) (agency decisions under the ESA are reviewed pursuant to the APA, the reviewing court can set aside such agency actions only when they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law or without observance of the

15

procedures required by law).

This is also the case under both Sections 7 and 9 of the ESA, *Sierra Club v. Glickman*, 67 F.3d 90 (5th Cir. 1995) (the appropriate standard of review of federal administrative agency action under both Section 7 and Section 9 of the ESA is the arbitrary and capricious standard prescribed by the APA). Review under the arbitrary and capricious standard is narrow, and the reviewing court may not substitute its judgment for that of the agency. *See, e.g., Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 109 S. Ct. 1851, 104 L. Ed. 2d 377 (1989); *Northern Spotted Owl v. Lujan*, 758 F. Supp. 621 (W.D. Wash. 1991) (the scope of judicial review under this standard is narrow, and the court is not permitted to substitute its own judgment for that of the administrative decision maker); *State of La., ex rel. Guste v. Verity*, 853 F.2d 322 (5th Cir. 1988) (court's scope of review under this standard is very narrow).

In exercising its narrow review under the arbitrary or capricious standard, the court is highly deferential to the agency's decision making authority, and has the least latitude in finding grounds for reversal. Therefore, where the review involves the interpretation of an agency's regulation, the court will defer to the agency's interpretation unless it is plainly erroneous or inconsistent with the regulation. *See, e.g., Natural Resources Defense Council v. U.S. Dept. of the Interior*, 113 F.3d 1121

(9th Cir. 1997) (holding that the court will accord a high degree of deference to an agency's interpretation of the statutory provisions and regulations that it is charged with administering), *Florida Key Deer v. Stickney*, 864 F. Supp. 1222 (S.D. Fla. 1994) (holding that an agency's construction of its own regulations is entitled to heightened deference if the interpretation is reasonable, regardless of whether the court would have arrived at the same interpretation independently), *Baltimore Gas and Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 103 S. Ct. 2246, 76 L. Ed. 2d 437 (1983) (agency's action will be upheld pursuant to the APA standard if the agency has considered the relevant factors and articulated a rational connection between the facts found and the choice made).

With probably too much law as its framework, the court says it cannot determine what, if any, final agency action is being challenged, and why this court is the proper forum for review of that action. As with the CWA, the Complaint, and the Reply, take EPA to task for not properly monitoring ADEM's permitting activities that are said to endanger (unnamed) species, something that is ADEM's responsibility. Further, the failure to consult with FWS is presented basically in a vacuum, i.e., is the EPA to consult with FWS about the entire Alabama NPDES permitting program's impact on (again unnamed) species? If not all species, then, which ones? And why? What is the EPA action or project that will impact an

endangered species? If the Complaint means that EPA has a general, non-species, non-project duty of consultation with FWS regarding ADEM's permitting activities and their effect on listed endangered species, the court says the ESA is not so broad, and it will not impose such a duty.

Mudd and WA also claim illegal ESA "takings". The proper standard for establishing a taking under the ESA has been defined as a showing of actual harm, either present or imminent. *See, e.g., American Bald Eagle v. Bhatti*, 9 F.3d 163 (1st Cir. 1993) (injunctive relief is appropriate only where petitioners have shown that the alleged activity has actually harmed the species, or if continued will actually, as opposed to potentially, cause harm to the species), *House v. U.S. Forest Service, U.S. Dept. of Agriculture*, 974 F. Supp. 1022 (E.D. Ky. 1997) (harm must be demonstrated by actual evidence, which may be in the form of scientific studies, but that, in order for the court to issue an injunction, the ESA does not require that the harm to the endangered species have already occurred). Again, the court says Mudd and WA assert general, not specific or project-oriented, agency action, and these assertions are insufficient allegations of a *prima facie* case.

To summarize, the court holds that EPA's approval of Alabama's NPDES general permitting programs does not, under the allegations of this Complaint, make out a violation of either the CWA or the ESA. Nor does EPA's flawed oversight, or

insufficient funding of either program, state a claim.

For these reasons[6], the EPA's Motion for Judgment on the Pleadings is **GRANTED**.

A separate Order will issue.

Done on October 3, 2005.

                                                **VIRGINIA EMERSON HOPKINS**
                                                United States District Judge

---

[6] The court does not address the EPA *res judicata* and the Sixty Day Notice of Intent To Sue arguments because neither is adequately raised in the Complaint. The elements of *res judicata* are not set out in the Complaint, and the Sixty Day Letter is attached to EPA's Memorandum, doc. 13, not the Complaint.